**KCST–TV, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**No. 81–2265.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 6, 1982.

Decided Jan. 25, 1983.

---

Arthur B. Goodkind, Washington, D.C., with whom Peter M. Connolly and Warren C. Zwicky, Washington, D.C., were on the brief, for petitioner. Alan Naftalin, Washington, D.C., also entered an appearance for petitioner.

William J. Roberts, Atty., U.S. Dept. of Justice, Washington, D.C., with whom Robert B. Nicholson and Barry Grossman, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief, for respondent U.S.A. Margaret G. Halpern, Atty., U.S. Dept. of Justice, Washington, D.C., also entered an appearance for respondent U.S.A.

Jane E. Mago, Atty., F.C.C., Washington, D.C., with whom Stephen A. Sharp, Gen. Counsel, and David M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on the brief, for respondent F.C.C.

Before TAMM, WILKEY and SCALIA, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

Dissenting opinion filed by Circuit Judge SCALIA.

TAMM, Circuit Judge:

 The network non-duplication rules generally provide that a cable system locat-ed within a certain distance of a network-affiliated television station must delete the duplicative network programming of a distant station that is carried on the system. An exception to the rules, which is found in 47 C.F.R. § 76.92(g), is that a cable system need not delete the programming of a television signal that is significantly viewed in the community where the system is located. The policy of the Federal Communications Commission (Commission or FCC) is to keep a station on the list of significantly viewed stations even if the station is actually no longer significantly viewed. KCST–TV sought a waiver of section 76.92(g) on the ground that a distant station, KNBC–TV, is no longer significantly viewed in San Diego County. The Commission refused to consider evidence of KNBC's lack of significant viewing because KCST did not demonstrate the rule's economic impact on KCST. We find that section 76.92(g) has no logical application in the face of a showing that a distant station is not significantly viewed, and we find no apparent policy basis for requiring a showing of economic impact before considering evidence of lack of significant viewing. Therefore, the Commission acted arbitrarily in not giving KCST's waiver application a "hard look." We set aside the Commission's order and remand the case for further proceedings.

## I. REGULATORY FRAMEWORK

The major television networks usually grant each of their affiliates exclusive rights to network programming within the affiliate's market. *See First Report and Order in Dockets 14895 and 15233,* 38 F.C.C. 683, 703 n. 29 (1965). Since the early 1960's, the FCC's "network non-duplication rules" have required cable systems to protect this network program exclusivity. *Id.* at 742–43.[1] Cable systems must delete network

---

1. The original rule provided:

    Where a station is entitled to program exclusivity, the CATV system shall, upon the request of the station licensee or permittee, refrain from duplicating any program broadcast by such station, simultaneously or within a period commencing 15 days prior to its broadcast by the station and ending 15 days

    after such broadcast, if the CATV operator has received notification from the requesting station of the date and time of its broadcast of the program and the date and time of any broadcast to be deleted, as soon as possible and in any event no later than 48 hours prior to the broadcast to be deleted.

programs broadcast by a distant station when those programs duplicate programs broadcast by local network affiliates. 47 C.F.R. § 76.92(a) (1981).[2] The premise of the network non-duplication rules is that a station's audience would be diluted if there were program duplication, which would diminish the station's advertising revenues and which might threaten the quality of the station's programming or the survival of the station. *See Wheeling Antenna Co. v. United States,* 391 F.2d 179, 183 (4th Cir. 1968); *Blytheville TV Cable Co.,* 68 F.C.C.2d 1065, 1067 (1978).

In 1978 the FCC adopted a new exception to the network non-duplication rules. *See Network Programming Exclusivity Protection—CATV,* 67 F.C.C.2d 1303, 1305–06 (1978), *aff'd, Spartan Radiocasting Co. v. FCC,* 619 F.2d 314 (4th Cir.1980) (codified at 47 C.F.R. § 76.92(g) (1981)). The exception

First Report and Order in Dockets 14895 and 15233, 38 F.C.C. 683, 743 (1965). The policy of preventing the duplication of network programs was recognized before the original rule was adopted. *See* Carter Mountain Transmission Corp., 32 F.C.C. 459, 463 (1962), *aff'd, Carter Mountain Transmission Corp. v. FCC,* 116 U.S.App.D.C. 93, 321 F.2d 359 (1962), *cert. denied,* 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963). See 47 C.F.R. § 76.92(a) (1981) for the present rule.

**2.** The rule provides:

Any community unit which operates in a community located in whole or in part within the 35-mile specified zone of any commercial television broadcast station or within the secondary zone which extends 20 miles beyond the specified zone of a smaller market television broadcast station (55 miles altogether), and which carries the signal of such station shall, except as provided in paragraphs (e) and (f) of this section, delete, upon request of the station licensee or permittee, the duplicating network programming of lower priority signals in the manner and to the extent specified in §§ 76.94 and 76.95.

A cable system that is required to delete a distant station's program may offer alternative programming on the distant station's cable channel, may carry the signal of the protected local station both on its regular cable channel and on the cable channel of the distant station, or may carry nothing on the distant station's channel.

As used in this opinion, "local stations" are those within whose specified zone the community of the cable system is located. All others

provides that a cable system is not required to delete the duplicating signal of any station that is "significantly viewed" in the cable system's community. 47 C.F.R. § 76.92(g) (1981). The Commission reasoned that significantly viewed stations are over-the-air competitors of local stations and, therefore, should be treated as local stations rather than distant ones. *Network Programming Exclusivity Protection—CATV,* 67 F.C.C.2d 1303, 1305 (1978).

The term "significantly viewed" was created in 1972 when the FCC adopted new rules for determining when cable systems were required or permitted to carry specific television signals. *See Cable Television Report and Order,* 36 F.C.C.2d 143, 170–71, 174–76 (1972).[3] The significantly viewed standard was used, first, as one of the criteria to establish the rights of television stations to carriage on cable systems and,

are "distant stations." *See* 47 C.F.R. § 76.92(b) (1981).

**3.** The Commission summarized the provisions for cable systems located in the fifty largest markets:

*First.* The following signals are required, upon request, to be carried:

(1) All market signals (See smaller markets above);

(2) Grade B signals of educational television stations;

(3) All translator stations in the cable community with 100 watts or higher power;

(4) Television stations significantly viewed in the cable community.

*Second.* A cable system may carry additional signals so that, including the signals required to be carried under the First priority, the following total may be provided:

(1) Three full network stations (subject to leap-frogging restrictions).

(2) Three independent stations (subject to leap-frogging restrictions).

*Third.* Generally, the cable system may carry educational and non-English language stations as described for smaller markets above.

The cable system may carry two additional independent stations (subject to leapfrogging restrictions); provided, however, that the number of additional signals permitted under this priority is reduced by the number of signals added to the system under the second priority.

Cable Television Report and Order, 36 F.C.C.2d 143, 171 (1972).

second, as one of the criteria to establish the rights of cable systems to carry a given television signal without that signal counting against the number of distant signals permitted to be carried under the FCC's rules. *Id.* The rules limiting distant signal carriage were repealed in 1980. *Report and Order in Dockets 20988 and 21284,* 79 F.C. C.2d 663, 889–90 (1980), *aff'd sub nom. Malrite T.V. of New York v. FCC,* 652 F.2d 1140 (2d Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982). "Significantly viewed," however, remains a part of the regulatory scheme that determines whether a cable system must carry a given station and whether the network non-duplication rules are applicable. *See* 47 C.F.R. §§ 76.57(a)(4), .59(a)(6), .61(a)(5), .92(g) (1981).

Significantly viewed signals in a given county are those that are listed in the *Reconsideration of the Cable Television Report and Order,* 36 F.C.C.2d 326, 379–463 (1972), plus those that have been proven significantly viewed since 1972. 47 C.F.R. § 76.54 (1981). The FCC's 1972 list was based on figures from Arbitron audience measurement surveys taken during three one-month periods in 1970 and 1971. *Reconsideration of Cable Television Report and Order,* 36 F.C.C.2d 326, 347 (1972). The Commission listed all television stations in each county in the nation that came within its definition of significantly viewed. To have been included in the 1972 list, a station had to achieve a minimum three percent share of total non-cable television viewing in the county and a non-cable net weekly circulation of at least twenty-five percent. *Id.* at 345 (codified at 47 C.F.R. § 76.5(k) (1981)).[4] The Commission has established

procedures under which stations not deemed to have been significantly viewed in 1972 can be recognized as having become significantly viewed since then. *See Cable Television Report and Order,* 36 F.C.C.2d 143, 229 (1972) (codified at 47 C.F.R. § 76.54(b) (1981)). The Commission has also established procedures under which stations not on the air when the 1972 list was prepared can be recognized as significantly viewed. *See Report and Order in Docket 20371,* 56 F.C.C.2d 265, 270 (1975) (codified at 47 C.F.R. § 76.54(d) (1981)). The FCC, however, has never adopted procedures for deleting a station from the 1972 list. The Commission justified this omission as an effort to "get cable moving." *See generally Cable Television Report and Order,* 36 F.C.C.2d 143, 164–65 (1972). The Commission wished to avoid disruption of established viewing patterns and to guarantee that cable systems would not be required to drop a signal once its carriage had begun. *Id.* at 175 n. 45.

## II. FACTUAL BACKGROUND

KCST–TV is a UHF station in San Diego, California, and is an affiliate of the NBC television network. Until 1978 San Diego cable systems[5] were required to delete Los Angeles station KNBC–TV's network programs when they duplicated KCST's programs. Under the 1978 exception to the network non-duplication rules, however, San Diego cable systems need not delete KNBC's programs because KNBC is deemed to be significantly viewed in San Diego County.

Counties are the geographic unit that the television audience measurement services[6]

---

**4.** A station's "viewing share" is its percentage of total television viewing hours in the relevant area. 47 C.F.R. § 76.5(k) (1981). "Net weekly circulation" is the percentage of television households that view a television station five minutes or more per week. *Id.*

**5.** A cable system that serves a community that is located in whole or in part within KCST's 35-mile specified zone is a San Diego cable system. *See* 47 C.F.R. § 76.92(a) (1981). The specified zone of a television station extends 35 miles from the reference point in the communi-

ty to which that station is licensed. *Id.* § 76.-5(f). A list of reference points is contained in 47 C.F.R. § 76.53.

**6.** The two major services are the Arbitron Company and the A.C. Nielson Company. The television industry and the FCC frequently rely on data produced by these two companies. The original list of significantly viewed stations was compiled on the basis of Arbitron data. Reconsideration of Cable Television Report and Order, 36 F.C.C.2d 326, 347 (1972).

use in gathering viewing information. San Diego County is an unusually large county. It is more than half the size of New Jersey, which has twenty-one counties. Contingent Petition of KCST–TV for Stay and Special Relief at 8, CSR–1270, Joint Appendix (J.A.) at 8. Northern San Diego County is almost equidistant from the cities of Los Angeles and San Diego. On the other hand, the city of San Diego is more than fifty miles south of the county's northern border and more than one hundred miles south of Los Angeles. Because of these geographic features, the ability of television viewers in northern San Diego County to receive the signals of Los Angeles stations directly off the air differs markedly from that of viewers in the City of San Diego. Also, San Diego County has a well-developed cable market, with more than thirty-eight percent of the county's television homes connected to cable in 1980. Supplement to Contingent Petition of KCST–TV for Stay and Special Relief, Exhibit 1 at 2, CSR–1270, J.A. at 32. Most Los Angeles television stations are carried on San Diego County's cable systems, and viewing levels for Los Angeles stations are much higher in cable homes than in homes receiving television signals off the air. Contingent Petition of KCST-TV for Stay and Special Relief at 4, CSR–1270, J.A. at 4.

When the FCC compiled the 1972 list, KNBC met the significantly viewed test in San Diego County. The other two Los Angeles network affiliates, KABC and KNXT, did not achieve significantly viewed status. Therefore, the adoption of the 1978 exception to the network non-duplication rule, which employs the 1972 list in determining which stations are significantly viewed, eliminated KCST's right to network non-

duplication protection. However, the ABC and CBS affiliates in San Diego retain their network non-duplication protection because KABC and KNXT are not on the 1972 list.

### III. CASE HISTORY

In April 1978 KCST filed a petition for special relief [7] requesting that the significantly viewed exception not be applied to end its non-duplication protection. First, KCST argued that KNBC is no longer significantly viewed in San Diego County. It produced Arbitron reports for San Diego County issued in 1976, 1977, 1979, and 1980.[8] The reports corresponded exactly to the audience measurement materials that the Commission had used in 1972 in compiling the original list of significantly viewed stations. Each report showed that KNBC had failed to meet the twenty-five percent net weekly circulation standard, which is an essential element of the definition of significantly viewed. See 47 C.F.R. § 76.5(k) (1981). Second, KCST argued that the rule places it at a competitive disadvantage because the other two network affiliates in San Diego continue to receive non-duplication protection. Third, KCST argued that the rule, as applied in this case, harms the competitive position of a UHF station (KCST) with respect to its VHF rivals (the other two network affiliates in San Diego), which violates a long-standing FCC policy of aiding disadvantaged UHF stations. See, e.g., UHF Television Receiver Noise Figures Report and Order, 69 F.C.C.2d 1866, 1869 (1978); Quaker CATV, Inc., 59 F.C. C.2d 1216, 1219 (1976). Fourth, KCST argued that KNBC is not a local San Diego station and is not a competitor of San Diego stations.[9] Last, KCST argued that waiver of the rule would lead to increased program

---

**7.** 47 C.F.R. § 76.7 sets forth the procedures for obtaining special relief.

**8.** KCST also produced a special Arbitron breakout of the 1980 data showing KNBC viewership in non-cable homes located only in zip code areas wholly or partially within the San Diego 35-mile zone. The special tabulation showed that KNBC had failed to achieve 25 percent net weekly circulation. Supplement to Petition of KCST–TV for Stay and Special Re-

lief at 4, CSR–1270, Joint Appendix (J.A.) at 23–25.

**9.** KCST submitted a supporting affidavit executed by the vice president of Storer TV Sales, who is experienced in television market research. The affiant stated that no advertiser would attempt to reach the San Diego market by purchasing advertisements on KNBC. Affidavit of Joseph Dowling, J.A. at 11–14.

diversity because cable systems are free to substitute wholly different programming for the programs that are deleted. Neither KNBC nor any major cable operators opposed KCST's special relief petition.[10]

In June 1981 the Cable Television Bureau, acting on authority delegated by the FCC, denied KCST's petition. The Bureau held that "signals listed by the Commission as significantly viewed are not subject to subsequent deletion," and, therefore, the showing that KNBC is no longer significantly viewed is "irrelevant to the instant proceeding." *KCST–TV, Inc.,* CSR–1270, mem. op. and order at 4 (Cable Television Bureau, FCC June 11, 1981), J.A. at 42. The Bureau also held that a station must produce evidence of the economic impact of the rule on it, which KCST did not do, to receive special relief. *Id.* at 5, J.A. at 43. Finally, the Bureau stated that even if the level of KNBC's off-air viewership were relevant, the studies done on a county-wide basis, as opposed to a community-specific basis, would be unacceptable. *Id.*

In July 1981 KCST petitioned the full Commission for review of the Bureau's decision. KCST's petition was unopposed. In October 1981 the Commission denied the petition. It held that it would consider granting a waiver of the significantly viewed exception "only upon a showing of some need for regulatory intervention in order to preserve local television broadcast service." *KCST–TV, Inc.,* FCC 81–494, mem. op. and order in CSR–1270 at 3 (FCC Oct. 28, 1981), J.A. at 58 (quotation marks omitted). Further, the Commission stated that even if the issue were relevant, county-wide data of the kind submitted by KCST would be insufficient. *Id.* at 3–4, J.A. at 58–59.

On appeal from the FCC decision, KCST argues that the Commission acted arbitrarily and capriciously in holding irrelevant its data showing that KNBC is no longer significantly viewed, its showing that the rule works to the competitive disadvantage of a UHF station, and its showing that KNBC is not a local competitor in San Diego County. Respondent United States of America, in a brief independent of the FCC's brief, agrees with KCST that the FCC arbitrarily denied the waiver request. Although otherwise defending its decision, the Commission argues that we need not address whether KCST's data, if it were relevant, would be insufficient because it is county-wide rather than community-specific. *See* Brief for Respondent FCC at 15 n. 17.[11]

### IV. Discussion

■ We must uphold the Commission's actions unless we find that they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). A reviewing court may not substitute its judgment for an agency's and must affirm an agency's decision if a rational basis for it is presented. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The arbitrary and capricious standard of review presumes agency action to be valid. *Id.* at 415, 91 S.Ct. at 823. "Presumptions of regularity apply with special vigor when a Commission acts in reliance on an established and tested agency rule. An applicant for waiver faces a high hurdle even at the starting gate." *Wait Radio v. FCC,* 135 U.S.App.D.C. 317, 321, 418 F.2d 1153, 1157 (1969). Nevertheless, an agency must take a "hard look" at meritorious applications for waiver, *id.,* and

---

**10.** A negative response was filed by a small cable operator who apparently provides service to fewer than one thousand subscribers and therefore is not required to comply with the network non-duplication rules. *See* Comments of Signal Master in CSR–1270, J.A. at 36–38; Brief for Petitioner at 20 n. 17; 47 C.F.R. § 76.95(b) (1981).

**11.** The Commission has held that community-specific data is available and that petitioners

bear the burden of showing that the necessary surveys are too expensive or too burdensome. KOIN–TV, Inc., 50 R.R.2d 715, 719 (1981). The Commission argues that we need not address this issue in this case. We agree because the Commission's statements concerning the issue were dicta. In any event, we have not been presented with sufficient information to review the Commission's position.

must consider all relevant factors, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823.

■■■■ The FCC held that the data showing KNBC not to be significantly viewed was irrelevant because KCST produced no evidence of adverse economic impact. The Commission's often-stated policy is to refuse to depart from its general rules concerning cable television in the absence of a showing of a rule's debilitating economic effect on a station. *See, e.g., Virginia Television Co.,* 51 R.R.2d 1048, 1050 (1982); *Virginia Broadcasting Corp.,* 89 F.C.C.2d 1152, 1159 (1982); *Valley Cable TV, Inc.,* 51 R.R.2d 225, 228 (1982); *Texas Community Antennas, Inc.,* 68 F.C.C.2d 1271, 1279 (1978); *Cable Television Report and Order,* 36 F.C.C.2d 143, 179 (1972); 4 *Radio Regulation* ¶ 85:92 (2d ed.1982) (collection of FCC decisions).[12] It is well within an agency's authority to adhere strictly to its rules unless a party can show "reasons why in the public interest the rule[s] should be waived." *FPC v. Texaco, Inc.,* 377 U.S. 33, 39, 84 S.Ct. 1105, 1109, 12 L.Ed.2d 112 (1964). The Commission holds that the public interest is not affected until economic injury to a station threatens to result in a loss of television service to the public. *See Desert Empire Television Corp.,* 86 F.C.C.2d 644, 649–50; *Cable Television Report and Order,* 36 F.C.C.2d 143, 179 (1972). This court has implicitly affirmed the Commission's refusal to depart from its cable television rules in the absence of a showing of economic consequence that threatens television service to the public. *KIRO, Inc. v. FCC,* 203 U.S.App.D.C. 318, 320, 631 F.2d

900, 902 (1980); *Pikes Peak Broadcasting Co. v. FCC,* 137 U.S.App.D.C. 234, 242–43, 422 F.2d 671, 679–80, *cert. denied,* 395 U.S. 979, 89 S.Ct. 2134, 23 L.Ed.2d 767 (1969). Therefore, applications for waivers that allege that the rules place a station at a competitive disadvantage or that another station is not a local competitor, but do not include data on economic impact, are generally rejected under the FCC's rules and policies. *See, e.g., Alexander City Cablevision Co.,* 48 R.R.2d 913, 916 (1980).

■■■■ An allegation that a distant station is not significantly viewed, however, is fundamentally different from an allegation that the rules place a station at a competitive disadvantage or that another station is not truly local. 47 C.F.R. § 76.92(a) provides network non-duplication protection because the Commission believes that the protection is necessary to protect local service. *See Blytheville TV Cable Co.,* 68 F.C.C.2d 1065, 1067 (1978). 47 C.F.R. § 76.92(g) removes a local station's protection against significantly viewed stations because the Commission believes that the stations are over-the-air competitors and that extending the competition to the cable market is not unreasonably damaging to local service. *See Network Programming Exclusivity Protection—CATV,* 67 F.C.C.2d 1303, 1305 (1978). Section 76.92(g) is premised on the distant station being significantly viewed. If the distant station is not in fact significantly viewed, the logic of applying section 76.92(g) collapses.[13] Conversely, an allegation that the rules place a station at a competitive disadvantage or that another

---

**12.** A waiver, of course, may be in the public interest notwithstanding a lack of economic impact on the station. For example, a waiver may increase public convenience or may avoid an illogical application of the rules. In such a case, a showing of economic impact is not necessary. *See, e.g.,* Alexander City Cablevision Co., 48 R.R.2d 913, 916 (1980) (though denying waiver, noting that substantial viewer inconvenience can justify a waiver); Capitol Cablevision Corp., 71 F.C.C.2d 281, 284 (1979) (applying de minimis principle and granting waiver where only a small portion of a city's population was within a station's specified zone).

The Commission's policy of requiring economic impact is well established and tested, *Spartan Radiocasting Co. v. FCC,* 619 F.2d 314, 322 (4th Cir.1980), and, therefore, waiver refusals receive a vigorous presumption of regularity, *Wait Radio v. FCC,* 135 U.S.App.D.C. 317, 321, 418 F.2d 1153, 1157 (1969).

**13.** For example, if a station's viewership in a county falls to nearly zero because of changes in its signal or because of population shifts, it is obviously illogical for the Commission to deem the station significantly viewed.

station is not truly local does not challenge the factual premise upon which section 76.92(g) rests. Rather, such an allegation challenges the standards established by the Commission. The FCC has determined that the significantly viewed standards fairly determine which stations are to be treated as local competitors. Establishing standards always involves difficult line drawing; nevertheless, the Commission is certainly within its authority in enforcing the standards in the absence of a contrary public interest. To do otherwise would erode the rules and lead to uncertainty in administering the law. An allegation that the rules place a station at a competitive disadvantage and similar allegations challenge the FCC's regulatory scheme, but an allegation that a distant station is not significantly viewed works within the FCC's regulatory scheme and logically compels that section 76.92(g) not apply.

In a decision analogous to the present case, *OkeAirCo, Inc.*, 44 R.R.2d 166 (1978), the Commission waived the non-duplication rules without a showing of economic impact when the petitioner showed the invalidity of the rules' underlying premise. OkeAirCo, a cable system, sought a waiver of the rule requiring cable systems to black out simultaneous distant network programming within 55 miles of certain local stations. *See* 47 C.F.R. § 76.92 (1981). The rule presumes that local stations are viewed within the entire 55-mile zone. OkeAirCo proved that the local station was not in fact viewed within the portion of the 55-mile zone that OkeAirCo served. In granting the waiver, the Commission stated, "A party demonstrating with persuasive evidence the invalidity of this underlying premise is entitled

to waiver." *OkeAirCo, Inc.*, 44 R.R.2d 166, 168–69 (1978). In the present case, KCST has similarly attempted to show the invalidity of the underlying premise of section 76.92(g).

The Commission justified applying section 76.92(g) by stating, "We have consistently held that signals listed by the Commission as significantly viewed are not subject to subsequent deletion." [14] *KCST–TV, Inc.*, CSR–1270, mem. op. and order at 4 (Cable Television Bureau, FCC June 11, 1981), J.A. at 42.[15] In compiling the list of significantly viewed stations in 1972, the Commission held that stations would not be deleted from the list because the Commission wished to avoid disruption of established viewing patterns and to guarantee that cable systems would not be required to drop a signal once its carriage had begun. *Cable Television Report and Order*, 36 F.C.C.2d 143, 175 n. 45 (1972). The term "significantly viewed" was created in 1972 when the FCC adopted new rules for determining when cable systems were required or permitted to carry specific television signals. *Id.* at 170–71. The significantly viewed standard was used as one of the criteria to establish the rights of cable systems to carry a given television signal without that signal counting against the number of distant signals permitted to be carried under the FCC's rules. *Id.* Therefore, if the Commission had deleted a station from the list of significantly viewed stations, a cable system possibly would have had to stop carrying the station, which would have disrupted viewing patterns. However, because the rules limiting distant signal carriage were repealed in 1980, *Report and Order in Dockets 20988 and 21284*, 79 F.C.

---

**14.** It could be argued that the FCC has considered evidence of significant viewing even in the absence of a showing of economic impact. *See* Desert Empire Television Corp., 86 F.C.C.2d 644, 649 (1981); KDUB–TV, Inc., 85 F.C.C.2d 572, 579 (1981). Although the FCC analyzed evidence of lack of significant viewing in each case, the discussions were arguably dicta. In more recent cases the FCC has clearly refused to consider such evidence by stating that "signals listed by the Commission as significantly viewed are not subject to subsequent

deletion." Telecable Associates, Inc., 51 R.R.2d 147, 153 (1982); Channel 41, Inc. (WUHQ–TV), 49 R.R.2d 1433, 1435 (1981).

**15.** The Bureau opinion and the Commission opinion cite the same decisions as support for this proposition: Memorandum Opinion and Order, 68 F.C.C.2d 1461, 1467–68, 1468 n. 14 (1968); Report and Order in Docket No. 20371, 56 F.C.C.2d 265, 267 (1975); Cable Television Report and Order, 36 F.C.C.2d 143, 175 n. 45 (1972).

C.2d 663, 889–90 (1980), there is no longer a concern that a station may have to be dropped from a cable system.

To achieve the FCC's goal of not disrupting viewing patterns, it was never necessary to bar the deletion of stations from the 1972 list for the purposes of the network non-duplication rules, as opposed to for the purposes of the station carriage rules.[16] Regardless, however, of any weak rationale that the station carriage rules might have offered for not granting waivers of the non-duplication rules, that rationale vanished when the station carriage rules were repealed in 1980.

Likewise, under the current rules there is no apparent rationale for not granting a waiver of the non-duplication rules when a party shows that a station is not significantly viewed. First, granting waivers would not disrupt established viewing patterns. If the signal a viewer normally watches were deleted, he would merely have to turn the channel to find his regular program.[17] Not only would the viewer be denied no program, but program diversity would actually increase because many cable systems would substitute wholly different programs. Moreover, in the present case viewers would not even have to learn to watch their regular programs on a different channel because the major San Diego cable systems have been voluntarily providing KCST with non-duplication protection. See Brief for Respondent FCC at 15 n. 15. Second, cable operators would not be substantially inconvenienced. They would not need to purchase switching equipment because they have been using such equipment to provide voluntary non-duplication protection to KCST and to provide mandatory non-duplication protection to the other network affiliates in San Diego. Third, administrative convenience does not justify not granting a waiver.[18] The Commission permits stations to prove that they are significantly viewed, 47 C.F.R. § 76.54(b), (d),[19]

**16.** The significantly viewed standard was not a part of the network non-duplication rules until 1978. See Network Programming Exclusivity Protection—CATV, 67 F.C.C.2d 1303, 1305–06 (1978).

**17.** The only difference in service would be some different commercials and news bulletins.

The dissent implies that our holding, because the mandatory carriage and network non-duplication rules operate in tandem, will permit San Diego cable systems to stop carrying KNBC and will thereby disrupt established viewing patterns. Dis. Op. at 1198–1199. The dissent, however, ignores the limited nature of our holding, which does not address the validity of the Commission's general policy of not deleting stations from the 1972 list. See note 21 supra. Moreover, the dissent finds it "strange" to "require cable systems to carry stations and then in turn require them to delete those stations' most widely viewed programming." Dis. Op. at 1199 n. 7. Actually, this situation is not "strange," for this was the exact state of the law between 1972 and 1978, when cable systems were required to carry significantly viewed stations and there was no significantly viewed exception to the non-duplication rules.

**18.** We recognize that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). Nevertheless, we believe administrative conve-nience was arguably one of the grounds upon which the Commission decided the present case. The Commission cited Cable Television Report and Order, 36 F.C.C.2d 143 (1972), which discusses the burdens of case-by-case determinations. Id. at 165. See also Notice of Proposed Rulemaking—CATV, 15 F.C.C.2d 417, 434 (1968) (proposed rules designed to eliminate case-by-case determinations). In contrast to its implicit reliance on administrative convenience, the Commission explicitly relied on its goals of avoiding disruption of established viewing patterns and of guaranteeing that signals will not be required to be dropped, by citing Cable Television Report and Order, 36 F.C.C.2d 143, 175 n. 45 (1972).

**19.** The dissent states that section 76.54(b) permits stations to demonstrate "that the viewing patterns shown by the [1970 and 1971] county-wide surveys were not representative of the viewing patterns within the cable system's particular service area." Dis. Op. at 1198. A more accurate statement is that section 76.-54(b) permits stations found not to have been significantly viewed in 1972 to be recognized as having become significantly viewed since then.

The dissent justifies the "once-in, always-in" approach by stating that off-the-air viewing surveys are now "meaningless" because "the cable genie is already out of the bottle," i.e., there is "no way to reconstruct off-the-air viewing patterns once cable has been carrying the signal." Dis. Op. at 1199, 1201. There is

which appears to be no less of a burden on the FCC than permitting stations to prove that distant stations are not significantly viewed. Furthermore, the following argument is unconvincing: While a presumption of economic impact, which is supplied by the significantly viewed standard, is generally needed for administrative convenience, such a presumption is not needed in the few cases where a party attempts to prove that a station is no longer significantly viewed. This argument fails because the Commission does not also disregard the presumption in the relatively few cases in which stations seek to prove that they have become significantly viewed. *See* 47 C.F.R. § 76.54(b), (d) (1981).[20] Fourth, disregarding the lack of significantly viewed status and requiring proof of economic impact is not merely an inconsequential shifting of the burden of proof. *Contra, Network Programming Exclusivity Protection—CATV,* 67 F.C.C.2d 1303, 1305 (1978). The Commission has stated that "the threshold is very high" for waivers and that waivers require "unique circumstances or anomalous consequences." *Blytheville TV Cable Co.,* 68 F.C.C.2d 1065, 1067–68 (1978). Additionally, individual economic predictions are usually difficult to make and subject to great dispute. Therefore, in refusing to grant a waiver upon a showing that a station is not significantly viewed unless there is also a showing of economic impact, the Commission arbitrarily placed a substantial burden on KCST.

no basis in the record for the dissent's argument, and, for obvious reasons, the Commission has never raised the point. First, the Commission regularly relies on these "meaningless" surveys when granting significantly viewed status to stations pursuant to subsections 76.54(b) and (d). Many of the stations acquiring the status undoubtedly have long been carried on cable in the areas for which they are receiving the status. Second, cable-connected homes are not included in the surveys, and the majority of homes in San Diego County and in most other areas are not connected to cable. San Diego County has about forty percent cable penetration, which is considered heavily cabled.

**20.** No evidence before us suggests that more stations achieve significant viewing status than lose it.

We find that section 76.92(g) has no logical application in the face of a showing that a distant station is not significantly viewed, and we find no apparent policy basis for requiring a showing of economic impact before considering evidence of lack of significant viewing.[21] Therefore, in considering the waiver application, the Commission acted arbitrarily in not giving KCST's audience data a "hard look." On remand the Commission may wish to consider (1) whether any policy in fact justifies not examining evidence of significant viewing unless there is a showing of economic impact, (2) whether KCST must present community-specific data, as opposed to county-specific data, and (3) what viewing level KCST must demonstrate to prove that KNBC is no longer significantly viewed.[22]

*The Commission's order is set aside, and the case is remanded to the Commission for proceedings not inconsistent with this opinion.*

SCALIA, Circuit Judge, dissenting:

I cannot call the Commission's action in this case arbitrary, capricious or abusive of discretion, and must therefore dissent. I set forth my views at some length because I believe that our readiness to entertain challenges of this sort, and to require the type of "fine-tuning" the majority demands, is one of the factors contributing to regulatory delay and to the increasing caseload of the courts.

**21.** Of course, "[t]he very essence of waiver is the assumed validity of the general rule ...." *Wait Radio v. FCC,* 135 U.S.App.D.C. 317, 322, 418 F.2d 1153, 1158 (1969). Therefore, the validity of the Commission's general policy of not deleting stations from the 1972 list or the validity of any other Commission rule or policy, other than the Commission's waiver policy, is not now before us.

**22.** To avoid having a station move continually back and forth between being and not being significantly viewed, the Commission may wish to establish standards that are more rigorous than those in sections 76.5(k) and 76.54.

Even if the majority opinion were correct in its assumption that "the logic of applying section 76.92(g)" hinges upon whether "the distant station is . . . in fact significantly viewed," Maj. Op. at 1192, the Commission's action would be well within the bounds of the reasonable. Some general rules, to avoid being arbitrary, must reach nothing that could be omitted without affecting their purposes. The analogy to laws regulating free speech comes readily to mind: they cannot be "overinclusive." Other general rules, however, are permitted to embrace a good deal of irrelevancy. Traffic ordinances require the motorist to observe a red light even at 1:00 a.m. on a deserted rural intersection. How approximate a rule may be without being arbitrary depends upon two factors: (1) the importance of the prohibition that the rule imposes (or the benefit it confers) to public and private interests; and (2) the difficulty of making the rule less approximate and more precise.

Still accepting the majority's premise that the ultimate objective of section 76.92(g) is to permit duplication of signals that are currently "significantly viewed," the Commission's rule assumes, in effect, that stations significantly viewed in 1970 (the year of the surveys on which the Commission's 1972 Cable Television Report and Order was based) are still significantly viewed. For all we know on the basis of the evidence before us that may be, overall, a pretty good approximation. But in any event the two factors I have described above would require, in the present circumstances, only a relatively rough one.

As to (1) *the importance of the rule to public and private interests:* The public interest served by insulating television stations from cable-carried competition is prevention of deterioration in local broadcast service caused by financial distress or failure of licensees.[1] That public interest cannot ultimately suffer from the approximative nature of the present rule, since if a station owner does not automatically qualify for needed protection under it, he can qualify independently after making a showing of economic distress. The rule is, in other words, only a "first cut" at the problem of identifying the necessary degree of protection from competition; it can afford to be a rough one, because a more refined cut follows.[2]

The private interest involved is, of course, the broadcaster's loss of the profits that would accrue from the restriction of competition. Were there a legal entitlement to these profits, the rule affecting them would have to be quite precise. That is not the case, however, since the Communications

---

[1] As the Commission stated in its 1980 Report and Order terminating its three-year inquiry into the distant signal carriage rules:

Because competition is the general requirement, the Commission is not to be concerned with the effects of competition on station revenues or profits. It must be concerned, however, if there is evidence that competition is so destructive or debilitating that it results in a loss of broadcast service to the public. *Report and Order in Dockets 20988 and 21284,* 79 F.C.C.2d 663, 666 (1980).

[2] The majority opinion asserts that "[a] waiver, of course, may be in the public interest notwithstanding a lack of economic impact on the station." Maj. Op. at 1192 n. 12. That proposition is unquestionably true. In a particular case, *any* circumstances could be brought forward to show that the public interest would be furthered by a waiver. It might be established here, for example, that the required deletion of the distant signal would cause the cable system to fill the vacated time with news and public affairs programming that the Commission deems to be in the public interest. But such extraneous consequences are not, I presume, the stuff of which the majority's mandatory waiver policy is constructed. At least where, as here, the requested waiver seeks not the *elimination* of a governmental prohibition, but the *extension* of one, surely the regulatory objective relied upon to justify the extension must be the particular regulatory objective which the rule itself pursues. Otherwise, it is indeed an open-ended and limitless regime of policymaking by adjudicatory waiver that the majority envisions. Therefore, when what is at issue is a rule designed to assure minimum financial viability of broadcast stations, the only circumstances that could conceivably be thought to require case-by-case extension of the rule's prohibition against competition would be those in which an effect upon such viability can be established. The Commission's "second cut" is entirely adequate to assure consideration of such circumstances.

Act does not confer immunity from competition. *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). The rule would even have to be moderately precise if its effect were to deprive petitioner of benefits to which it was not entitled, but which the public interest demanded. That also is not the issue here, since, as just discussed, the case-by-case inquiry available upon a showing of economic distress assures consideration of public interest needs. The essence of petitioner's complaint is simply that the Commission's "first cut" automatically gives unneeded profits (unneeded as far as the public interest is concerned) to some other stations but not to KCST. That is not, I think, a complaint that calls forth a heavy burden of justification. An agency is not permitted to scatter the incidental benefits of its regulatory scheme haphazardly, but neither must it adjust an allegedly "inequitable" distribution that is produced by a measure reasonably designed to achieve efficiency and dispatch in the pursuit of its principal public goal. If the network nonduplication rule is, for the public interest purposes it is meant to achieve, a reasonable one,[3] the "inequity" between KCST and those stations that obtain the windfall of unneeded profits is no different from the inequity between KCST and those citizens who have not received the windfall of a television broadcasting license.

As for (2) *the relative ease of adopting a more precise approximation:* The use of current surveys would obviously involve substantial administrative inconvenience to both the Commission and cable systems, producing a recurrent phasing in and phasing out of various stations as viewing patterns and other factors change back and forth. The majority's last footnote suggests that this inconvenience could be avoided by requiring lower viewing percentages for the retention of "significantly

viewed" status than for its acquisition in the first place. That amounts to acknowledging that a healthy degree of imprecision in this matter is not only inevitable but positively desirable. The degree produced by the majority's approach is undoubtedly somewhat lesser (since it permits case-by-case evaluation) than continual reliance upon the 1970 surveys. But that indeterminately greater precision comes at some expense, and I cannot say that the Commission's method is arbitrary or indeed even less desirable. I suppose that after a very large number of years it will be true that the 1970 surveys are *inordinately* unindicative of current viewing patterns, even for purposes of a "first cut" at the problem the Commission wishes to address. But I have no basis for saying that on the present record. I suspect, moreover, that the Commission is not only a much better judge of that than we but also has adequate incentive to remedy the difficulty—namely, the incentive of having to process the increased number of applications for case-by-case exemption that the disparity will produce.

The foregoing discussion has assumed the validity of the majority's assumption: that the ultimate purpose of the rule was to reach a rough approximation of current viewing patterns. In fact, however, I think that is not so. In my view the purpose of the rule was, is, and may properly be, to establish quite simply a "once-in, always-in" regime. That is to say, once a cable system has been given the right and the obligation to carry a particular signal as a local signal, it retains that right and obligation permanently. Actual viewing patterns are thereafter irrelevant to the Commission's policies, except that they may be one of many factors considered in ruling upon a request for network nonduplication protection by a station that can demonstrate economic

---

**3.** It is *not* a reasonable one, of course, if the Commission's "first cut" confers automatic protection upon too many stations that do not need it in order to remain financially viable. Cable systems could presumably challenge the scheme on that basis. But I doubt that KCST

has standing to attack such a defect by demanding that it, too, be included among the unnecessary beneficiaries of the agency's runaway generosity—at least if it makes no showing that one of its competitors is advantaged by the excess.

harm resulting in potential loss of broadcast service.

I am led to this conclusion first, by the clear language of the rule itself. It used the term "significantly viewed station," but that was a term of art which meant a station that:

(1) if included within the surveys used for purposes of the Commission's 1972 Cable Television Report and Order, was listed in Appendix A to that Report and Order under the county in which the cable system's community is located; or

(2) if not included within those surveys, can be shown to meet the same viewing share and net weekly circulation tests in the county as were required for inclusion in Appendix A; or

(3) whether or not included within the surveys (which were county-wide) can be shown to meet those tests within the cable system's particular community.[4]

It could not be clearer that the Commission was adopting neither a test that *requires* current achievement of particular viewing or circulation percentages, nor even a test that is *designed to indicate* current achievement of particular viewing or circulation percentages. The latter is evident from the fact that, while some provision is made for subsequent inclusion as a "significantly viewed" station on the basis of actual, current viewing patterns, *see* 47 C.F.R. § 76.-54(b), (d), no provision is made for subse-

quent deletion on that basis. Moreover, even the provisions for subsequent inclusion are *not* designed to take account of changes in viewing patterns over time, but rather to accommodate stations (presumably new stations) not covered by the 1970 survey, 47 C.F.R. § 76.54(d), or to permit demonstration, through community-specific surveys, that the viewing patterns shown by the county-wide surveys were not representative of the viewing patterns within the cable system's particular service area, 47 C.F.R. § 76.54(b).[5] Apart from these narrow exceptions, the rule represents not only a "once-in, always-in" but even a "once-out, always-out" approach. All that is simply not compatible with the notion that a rough approximation of current viewing was the object.

There are extremely good reasons why the Commission adopted a "once-in, always-in" approach. To begin with, it avoids the disruption of the public's viewing patterns. It is true (as the majority states) that since the 1980 elimination of limitations on distant signals, a station's loss of "significantly viewed" status will not *require* a cable system to drop that station or another distant signal. But it is also true, since the mandatory carriage and network nonduplication rules operate in tandem,[6] that loss of the status will *permit* a cable system to drop a station that cable viewers in the area have received regularly and that at least a sub-

---

4. The definition of "significantly viewed" to which the nonduplication rule refers reads as follows in relevant part:

(a) Signals that are significantly viewed ... are those that are listed in Appendix A of the memorandum opinion and order on reconsideration of the [1972] Cable Television Report and Order ....

(b) Significant viewing in a cable television community for signals not shown as significantly viewed under paragraphs (a) or (d) of this section may be demonstrated by an independent professional audience survey ....

....

(d) Signals of television broadcast stations not encompassed by the surveys ... used in establishing [the 1972 designations] may be demonstrated as significantly viewed on a county-wide basis by independent professional audience surveys ....

47 C.F.R. § 76.54 (1981).

5. The majority opinion states that these limited exceptions which permit stations to show that they are significantly viewed appear "to be no less of a burden on the FCC than permitting stations to prove that distant stations are not significantly viewed." Maj. Op. at 1194–1195. That is questionable, since the first of the exceptions applies only to stations not surveyed in 1970, and the second requires the applicant to commission a special community-specific survey not routinely conducted by the rating services. *See* 40 Fed.Reg. 11000 (1975); 40 Fed.Reg. 48928 (1975). But even if they are as burdensome, the burden is undertaken for an entirely different purpose.

6. *Compare* 47 C.F.R. §§ 76.57(a)(4), 76.59(a)(6) and 76.61(a)(5) *with* 47 C.F.R. § 76.92(g).

stantial number of such viewers regard as "local." [7]

Another compelling reason for the "once-in, always-in" approach is the distortion of the over-the-air viewing percentages caused by cable carriage once it is permitted. Assume, for example, a county in which a distant signal met the "significantly viewed" percentages in the 1970 survey because of large off-the-air viewership in the county's northeast quadrant. Assume, further, that a cable system has since "wired" 80% of the homes in that northeast quadrant, so that four out of five viewers who previously watched the station "off the air" no longer do so. The station would then no longer meet the "significantly viewed" standard, even though it is no less "local" than it ever was. There is, in other words, no way to reconstruct off-the-air viewing patterns once cable has been carrying the signal. It seems very likely that those viewers most loyal to a relatively weak not-so-distant distant signal would have been first in line to "get wired." To be sure, the Commission's approach permits significant viewing to be considered as one of the relevant factors where financial dis-

tress has been shown, but in that context it can be discounted for the sort of distortion just described and in any event need not determine the outcome.[8] But making such an inherently unreliable factor the very touchstone of entitlement to relief is quite another matter.[9]

The Commission's statements and practice are entirely consistent with the alternative view of the network non-duplication exception I have suggested. The Commission stated in its 1972 Cable Television Report and Order that the list of "significantly viewed" stations would not be subject to deletion on the basis of "some special showing or later survey." 36 F.C.C.2d at 175 n. 45. It has never permitted such deletion. And in granting or even considering exemption from the "significantly viewed" exception to the network nonduplication prohibition it has—as it originally said it would [10]—insisted upon a showing of economic injury that would be detrimental to broadcast service.[11] As it correctly said in the Memorandum Opinion and Order here under challenge, "[i]t can no longer be open to question that economic impact is a prime constituent element of our waiver analysis." Joint App. at 58.

---

**7.** This result could be avoided of course, by severing the mandatory carriage and network nonduplication provisions, so that the former would continue to be governed by a "once-in, always-in" rule while the latter would be subject to the continuous assessment of actual viewing decreed by the majority opinion. That, however, would produce the strange (one might almost say capricious) result that the Commission would require cable systems to carry stations and then in turn require them to delete those stations' most widely viewed programming.

**8.** The Commission also relies upon whatever a current off-the-air survey shows (even in a "wired" community) for making the initial determination that a new station is significantly viewed, or that significant viewing exists at the community level (rather than the county-wide level covered by the 1970 surveys). *See* 47 C.F.R. § 76.54(b), (d). Necessarily so, since no earlier survey depicting the relevant off-the-air market in a more pristine state exists. Replacing nothing with something is different from, what the majority suggests here, replacing better with worse.

**9.** This particular justification for the "once-in, always-in" approach was not argued by the

Commission. Even if we felt constrained to disregard this obvious practical factor as a basis for sustaining the Commission's approach, we can hardly ignore it in reaching our own conclusion that an "actual viewing" approach is required.

**10.** The Commission stated when it denied reconsideration of the network nonduplication rule that "[i]f parts of these signals are to be deleted from cable carriage, that action should be taken ... only upon a showing of some need for regulatory intervention in order to preserve local television broadcast service." *Reconsideration of Network Programming Exclusivity Protection—CATV,* 68 F.C.C.2d 1461, 1468 (1978).

**11.** The *OkeAirCo* case cited in the majority opinion, 44 R.R.2d 166 (1978), did not involve an exemption from the "significantly viewed" exception to the network nonduplication prohibition, 47 C.F.R. § 76.92(g), but rather an exemption from the prohibition itself, 47 C.F.R. § 76.92(a). Moreover, as to that, the Commission had never adopted a "once-in, always-in" approach.

On either ground, therefore, the Commission's rule and the practice under it seem to me sustainable: Either as a means of identifying those stations that are currently significantly viewed—an identification that is, for plausible reasons, rough and ready, but need only *be* rough and ready since the only cognizable interest it affects, the public interest, is fully protected by a follow-on inquiry that is case-by-case and more precise. Or (what I think is actually the case) as a means of taking into account a factor which, in the nature of things, can only be taken into account once (as it was in 1972) and thereafter becomes submerged in the waves of advancing technology.

The majority cites *WAIT Radio v. FCC,* 135 U.S.App.D.C. 317, 321, 418 F.2d 1153, 1157 (1969), for the proposition that the agency "must take a 'hard look' at meritorious applications for waiver." Maj. Op. at 1191. Unless one reads the word "meritorious" in such fashion as to drain the statement of all meaning (so that for some rules there can be *no* meritorious applications); or unless one assumes (with equally emasculating consequences) that it is permissible to take only a "soft look" at *whether* the application is meritorious; as a generally applicable proposition that statement seems to me neither self-evident, nor logically supportable, nor sustained by the holdings, or even the internal practices, of the courts. It would mean, in effect, that there could be no rules but only case-by-case adjudication. What *is* true, and what in my view *WAIT* represents, is the proposition that a rule *which otherwise might be impermissibly broad* can be saved by the "safety valve" of waiver or exemption procedures.[12]

That does not preclude the possibility that an agency may craft a rule which—either because it is quite precise or because the subject is not one as to which precision is required (see the discussion at the outset of this opinion)—does not need for its validity the availability of exemption. Moreover, I know of nothing which prevents an agency from making one of its rules inflexible, leaving the courts (if they consider it invalid in that form) only the power to strike it down and require a more precise rule, but not the power to mandate the agency's administrative choice between a regime governed entirely by rule and one in which adjudicatory waiver determinations must be made. Cf. *FPC v. Texaco, Inc.,* 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134 (1974).

But the incursion into agency management effected by the majority opinion goes further than merely telling the FCC it cannot have an inflexible rule. It tells the agency it cannot have a flexible rule which contains only a single exemption process. The "safety valve" referred to in *WAIT* does exist. The agency has *assumed,* in the words of *WAIT,* 418 F.2d at 1157, 135 U.S. App.D.C. at 321, the "obligation to seek out the 'public interest' in particular, individualized cases." As noted earlier, the only public interest at issue is avoiding the deterioration of broadcast service caused by financial distress; and waiver of the present rule is always available where such distress can be shown. What the majority opinion demands is a second "safety valve," seeking to assure not the public interest but a more

12. This is the limitation which the *WAIT* opinion meant to suggest when it said that "[t]he agency's discretion to proceed *in difficult* areas through general rules is intimately linked to the existence of a safety valve procedure for consideration of an application for exemption based on special circumstances." 135 U.S. App.D.C. at 321, 418 F.2d at 1157 (emphasis added). It is worth noting that the Supreme Court cases cited by *WAIT* to establish even this limited proposition did not involve situations in which a rule was asserted to be merely imprecise in its application. Rather, they all involved the quite different assertion that the matters determined by the rule were required by statute to be determined on a case-by-case basis, in individual licensing proceedings. *FPC v. Texaco, Inc.,* 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). The Supreme Court held that the availability of a waiver or exemption procedure satisfied the statutory requirement for individualized consideration. It is on this airy foundation that the Castle of Waiver-Under-All-Rules has been raised.

equitable distribution among private parties of the profits which the nonduplication rules provide.

Finally, I believe the decision today to be inconsistent with earlier opinions of this court approving the Commission's refusal to afford any applicant a dispensation from its cable television rules without a prior showing of economic harm that imperils broadcast service. *KIRO, Inc. v. FCC,* 203 U.S. App.D.C. 318, 631 F.2d 900 (1980); *Pikes Peak Broadcasting Co. v. FCC,* 137 U.S. App.D.C. 234, 242–43, 422 F.2d 671, 679–80, *cert. denied,* 395 U.S. 979, 89 S.Ct. 2134, 23 L.Ed.2d 767 (1969). The majority opinion distinguishes these cases by asserting that "[a]n allegation that a distant station is not significantly viewed ... is fundamentally different from an allegation that the rules place a station at a competitive disadvantage ...." Maj. Op. at 1192. I do not see why. What is crucial in determining whether a waiver must be granted is not violation of the abstract "logic" of the rule at issue (assuming, what is not true, that the logic would be violated here) but rather frustration of the public policy which the rule is meant to pursue. It seems to me that assertion and proof of competitive harm comes much closer to establishing frustration of the policy at issue here (financial viability of broadcast stations) than does the assertion that a competing distant signal is not "significantly viewed." Indeed, the latter is merely a step towards proving the former.

The Commission has established a scheme which, if it falls short of possible further refinement (which I doubt), does not clearly do so, and does not do so in a degree that can be regarded as arbitrary. Indeed, I think the approach which the Court now imposes upon the Commission is a better candidate for that designation, since it would give automatic legal effect to off-the-air viewing surveys in communities where—since the cable genie is already out of the bottle and cannot be pushed back in—such surveys are meaningless.

For these reasons, I respectfully dissent.